Clerk, call the next case please. Case number 10-2482, people be James Schuyler. Okay, counsel, please approach and let us know who you are and who you represent. Both of you. My name is Jeff Spalos. I'm an appellate defender and I represent the appellant defendant James Schuyler. Assistant State's Attorney Patricia Berlin on behalf of the people. Okay, great. You guys know the drill, 15 minutes per side saves some time for rebuttal. Let's see if we can keep this one on time. May it please the court. This case is about a single piece of evidence, partial palm print. I've raised five issues. I'd like to focus on the first three, all of which involve that partial print. First, that print alone was not enough for conviction, given the print examiner's experience. Second, the jury was told too little and too much about the examiner's ability to match that print to my client, Mr. Schuyler. They were told too little in that because defense counsel was prevented from crossing the examiner in two significant respects, they couldn't properly evaluate his conclusion. They were told too much in that it hurt evidence suggesting that his jury failed to prove Schuyler's guilty beyond reasonable doubt. Daniels, the print examiner in this case, was inexperienced and poorly qualified. We know that in June 2009 when he got this print from the scene for identification, he'd only just finished his apprenticeship and started comparing prints on his own. He's not certified by the International Association of Identification and his lab was not accredited. He only had a partial palm print to work with here and he didn't get any elimination prints. In other words, he didn't get prints from people with lawful access to the home. The gentleman who lived there, Mr. Kahn, his wife, his sister-in-law. And as the secondary sources show cited in the briefs, the method he used was subjective and unreliable. This is a method that's not really amenable to objective verification the way, for example, DNA analysis is. And this reasonable doubt issue is one of the reasons that Daniels was denied the opportunity to have the jury fairly evaluate the reliability of Daniels. And as a result, we can't really have confidence in the jury's verdict here. If there are no more questions, if there are questions on issue one, I'm going to move on to the second issue. And that is the trial court violated Mr. Schuyler's right to confrontation by preventing his attorney from crossing Daniels, asking him hypothetical questions, challenging the basis of the conclusion that the prints matched, and also largely prevented him from asking the examiner about the error rate associated with this method. Now, it's clear error for the court to sustain these objections, the State's objections. Counsel has the right to ask questions challenging experts on the basis of their conclusions. And the bases in a method he used, and those two bases were the ones that Schuyler's attorney was attacking. Now, this error is not harmless beyond a reasonable doubt. And because we're talking about a Sixth Amendment violation, the State has to show that it was harmless beyond a reasonable doubt, and it cannot do that here. What was the factual basis for the hypothetical questions that he was asking about the dividing ridges? Where was the basis for that in the record? Well, Your Honor, I don't think this case is like Herman, which is the case that the State cites for the question that you're getting at, where, in that case, the question involved, it was a drug case, and defense, or the counsel there asked about, well, what if water was introduced to these drugs? Would that throw off your opinion? And that is a question about the facts. But here, we're not really talking about facts. We're talking about the method and the reliability. So I think it's unfair to really call it facts. It has to do with his method. You know, if you're assuming X, let's change how you're thinking about this. Let's say it's Y. Would that throw off your opinion? These questions aren't just going to the idea that a single dissimilarity throws off the match. It's going to his ability to reliably compare these points. And again, these lines of cross went directly to the crucial witness on the crucial point. Can you match these prints reliably? The State's case here was just about this partial print. And we know that the jury thought it was a close case. They asked first, what if we can't come to a unanimous verdict? Then it asked, well, what about this other qualified examiner? And I'll get to this back in Issue 3. But who is this guy? What are his qualifications? And immediately after getting an answer that says, basically, continue deliberating, the jury convicts Mr. Shasley. And this is also not a harmless ban or easy vote, because shutting down these lines of cross also foreclosed argument. As White shows, in that case, the defendant didn't even try to press the print examiner as to the dissimilarities between these prints. And as a result, argument was not available in closing. If there are no more questions on Issue 2, I'm going to move along to Issue 3. There, the court committed prejudicial error by allowing Daniels to testify over objection that he sent the prints to another qualified examiner. That testimony was at once not probative and prejudicial. It was not probative because the jury was not told who this examiner was, as the jury note suggested, what his qualifications were, what her qualifications were. It was also not probative, as the State contends, to show the procedural steps Daniels took in matching the prints. And that's because, for two reasons. First, this statement about another qualified examiner came out on direct. But Daniels didn't testify as to this ACB method until cross. And so at the time that the erroneously admitted statement comes out, the jury has no idea about this ACB method and what its potential probative value is. Secondly, it couldn't be probative to that V step, V stands for verification, because Daniels never out and said, yeah, I sent it to another qualified examiner and he verified my match. Then it might have been probative, but it also would have been a Crawford problem. Testimony was prejudicial because it made it sound like the examiner did in fact corroborate Daniels' conclusions. In effect, it allowed one testifying expert to qualify another. It allowed the State to get two for the price of one, basically. Well, isn't that where argument comes in, though? He's just establishing procedure. And then in argument, you never heard from the verifying technician, and that's fertile ground for argument. Yeah, I suppose it is fertile ground for argument, but that doesn't change the fact that it was prejudicial, and it doesn't change the fact that the jury was focused on it. I mean, the jury asks to know. It wants to hear about this other examiner. And, you know, as a practical matter, your defense counsel, you know something damaging came in. But it cuts both ways, doesn't it? Couldn't it just as easily be construed by the fact finder that the State didn't get verification from this individual, so they didn't offer his testimony? I think the way that it's more likely to cut is that the jury might think all of this, Your Honor, is speculation. But it could just as easily be that the jury could think, well, if this other person didn't corroborate the result, where is he or her? Why isn't defense producing him? But there's no need for the court to speculate because the prejudice lies in the statement coming in at all, and we know that the jury was focused on it because they asked this note. Right after asking what if we can't be unanimous here, they ask, well, what about this other examiner? That shows prejudice here. What was the basis of the objection that counsel made to this evidence? It's not prejudicial. I mean, are you saying it was preserved? It was not an objection that it was hearsay, for example. Yes, Your Honor. Well, it wasn't hearsay because, as I said, Daniels didn't out and say, this is what the person was saying. It wasn't a declarant statement. But that's what you're saying that the jury may have been thinking. Possibly. I mean... I mean, if that's the concern, wouldn't a hearsay objection be more appropriate? No, I don't think a hearsay objection would have been appropriate because, again, the... I mean, this is one degree of separation from hearsay because it suggested, it left the suggestion on the table that this other examiner, unknown examiner, corroborated the finding, but there was no statement per se. No, I know, but that's what you're worried about is that issue lingering out there, sitting out there in the courtroom that the jury could latch on to and say, you know, where's this other person? Why didn't the defense call? More to the point, the jury was concerned about it, and that's what shows it's prejudicial. Okay. Is there any other questions on Issue 3? It's a general objection, right? Yes. It's a general objection as to relevance. It's not relevant if you're not going to give us the next step and tell us what the results of this secondary examination... Yes, I don't think he could object... Counsel could object on hearsay grounds, and, you know, there is case law that none of us has cited, but, you know, if you object just in a general way, courts have understood that to be a relevancy objection. So, as I stated, this was not probative. But it certainly was prejudicial, especially given the jury's note on it. If there are no more questions on this third issue, I'd like to conclude by saying I ask this Court to reverse Shisley's conviction outright because the only evidence against him was his partial print, and that was insufficient. And at a minimum, I ask that this Court grant Shisley a new trial under Issues 2 and 3 because those issues show, especially together with Issue 1, that we can't have confidence in the jury's verdict here. Thank you. May it please the Court. Again, my name is Assistant State's Attorney Patricia Berlin on behalf of the people. Your Honors, on June 29, 2009, while Mr. and Ms. Kahn were sleeping and their daughter was sleeping, defendant entered onto their property, walked into their backyard through a gated, latched fence, stepped onto an air conditioning unit, raised the window, raised the screen first, and then the window, and removed a television from inside the house. Despite defendant's statement that he didn't go into that neighborhood, the evidence at trial proved otherwise as evidenced by defendant's palm print on the outside of that window. Those, I think, might be properly characterized as the cleanest windows in Beverly. Those likely were the cleanest windows in Beverly, considering they were washed every two weeks inside and out. Okay. That evidence, combined with the rest, satisfied both the physical and temporal proximity requirements when a conviction rests on a fingerprint. To be clear, that was not the only evidence that that conviction rests on. You have defendant's statement roughly a month after this incident. Defendant was confronted with a photograph of the house, asked, do you recognize the house? He didn't. He asked for the address. Doesn't know the address. He then asked the officers where that house was located in the city, and when he was told that it was the Beverly neighborhood, defendant said, I don't go there. I haven't been there recently. That's in direct contradiction to his palm print being on the outside of that window, the window that was raised in order to gain access to the TV. The timing of the situation occurred in a very small window, 2 till 645, somewhere in that time frame is when this incident occurred. The windows at 2 a.m. were down position, 645 up when the TV was gone. The print was fresh. It had been left sometime within the last couple hours. Are you concluding it was fresh based on the testimony of the evidence technician or based on the attendant circumstance, the testimony of I clean these windows every two weeks and the homeowner saying I went to bed at 2 a.m. and the windows were smudge free? Both pieces of evidence. The evidence technician testified to the freshness and testified extensively to that. How can he do that, though, absent the testimony of the homeowner? How can he say a print is 10 days old or 10 months old? The technician testified to his qualifications, his training in that area, and that he was able to identify whether or not it was an expired print that had collapsed or if it had been left within a recent amount of time. What does that mean, though, in terms of time? He talks in vague terms of recency or aged prints. Right. But never in terms of time frame. He does not talk specifically in terms of time frame. Except for his testimony on this palm print when he can say it was several hours old. That's correct. And when you combine that testimony that he can say that it was within a couple hours with the testimony of the homeowners that they cleaned their windows frequently and that there were smudge marks or marks on the window the night before, combining those two together enables us to say that it is a fresh print.  But do they support the opinion advanced by this evidence technician? The opinion that it was a fresh print was advanced by the homeowners' testimony at trial. When the window's location was also in a private area, it was surely available to the public, but in order to gain access to it, one would have to enter the backyard of the home, which was on a cul-de-sac, and gated and was a private enough location to satisfy the temporal proximity requirement for fingerprints. With regard to the cross-examination of the expert witness, the expert being Officer Daniels, at trial counsel was allowed to effectively cross-examine and cross-examine both regarding the error rate and hypothetical questions. Surely the error rate is a topic that counsel was entitled to cross-examine on, and he did ask the expert what the error rate was for fingerprint identification, and the expert was able to say that when the proper methodology is used, the error rate is zero. The next time that counsel tried to elicit that same information, there was an objection which was sustained because that information had already come out. With regard to the hypotheticals, there were numerous hypothetical questions that were sustained, but sustaining those questions did not prevent counsel from attacking the credibility of this witness. The counsel elicited information that it's sometimes difficult to tell whether an ending ridge is part of a dividing ridge or a raised ridge. He asked those questions and got the expert to admit that, yes, that is hard, and it's especially hard with latent prints. He got the expert to discuss that the clarity of the print can affect his confidence level and his ability to compare two prints, that the expert found over 15 points of comparison similarities, that he did not include those numbers in his report. He attacked the credibility based on his experience, his times he's testified, the professional organizations he belongs to. He attacked on numerous points. And just because a couple questions were sustained on his cross-examination did not prevent him from attacking the expert witness. He was confronted. Yes, he was surely confronted. And with regard to the expert's testimony on the V, the verification step, that testimony was entirely proper and the court's ruling was entirely proper as well. On direct examination, when the expert was testifying, he only stated in very limited terms that he gives the latent impression in the palm print card to another qualified examiner who does his own independent examination. And when the objection was made, the court overruled the objection with very specific and detailed ruling. He said he didn't say what the results of the other person were. Overruled. In doing this, the court was assuring that the jury was in no way going to be misusing any of that evidence. Told the jury, this is all you get. You're not getting more. It was as good as a limiting instruction in any other sense. And there's no indication that that ruling was made outside the presence of the jury or at a sidebar, whereas there are points in the record that do indicate that other objections were heard outside the presence of the jury. And the judge further assured that the jury would not misuse this evidence when he responded to their question. The jury question was that they wanted the name and qualifications of the other examiner. The court responded that they have the evidence and to keep deliberating. This was actually the response that defense counsel had suggested that the court send out to the jury. To be clear, the testimony at trial never elicited information about that other examiner's name, their qualifications, their process they employed, any steps they took, and surely never discussed their finding. And the steps of responding to the jury and in the court stating and overruling the objection, both of those steps assured that the jury did not misuse this evidence. And that the timing of the question somehow implied that this had a strong effect of their determination of guilt. This was a generally inquisitive jury. When you look at all the questions, they wanted a whole slew of information that they were not entitled to. They wanted to know whether or not the defendant gave an alibi statement. That did not come out at trial at all. They asked five series of questions, and this was just one of them. Do those, as you characterized, slew of questions speak to the weight of the evidence or lack thereof in this case? It doesn't speak to the weight of the evidence. It just shows that you had a jury that just, they wanted more. They wanted things they didn't have, or at least you had one juror who had that. But the evidence was sufficient. There was no need for the people to call this other expert. One expert testified that the match was surely enough. There was the only way for this court to review defendant's argument that this jury question means that the jury considered this other expert or other examiner's findings and that it weighed heavily on their opinion. The only way to do that would be for this court to engage in speculation and conjure something that this court cannot do. For all the reasons stated here today and those in our brief, people would ask that this court affirm defendant's conviction. Thank you. The jury did want more, and it was not just speculation. The case cited in the brief here, Smith, third district case from 1994, shows where a jury asked a very similar note in a print case about an examiner. That note shows, quote, the jury was acutely interested in print evidence and other examiner in particular. It's just speculation to say that the jury wasn't interested in, the state says. But that case shows that, and common sense shows that, ask this question, and six minutes later there's a conviction that they were interested in it. Just a couple more points. Back to counsel's first argument on reasonable doubt. Sure, there was other evidence in this case. There was testimony from Kahn and from Flisk. However, the only thing connecting Shisely was this print match. That's it. Kahn could testify, assuming he was credible, he can only testify to the timing of the thing. That doesn't put my client at the burglary. Sure, the homeless burglar, that doesn't mean Shisely did it, and he didn't do it here. Second, just one final point. Yes, there was some cross-examination allowed, but the cross-examination that really mattered, that really went to the basis of the conclusion here, were the ones disallowed. What's the basis for your conclusion? Are you able to identify these prints and compare them accurately? What's the method behind this? Those were the questions that were denied, and most meaningful ones, and it doesn't show there was a confrontation violation here. In conclusion, again, I ask that this Court reverse Shisely's conviction or remand for new trial. Thank you. Okay, thank you very much, Counsel. We'll take the matter under advisement, and you'll hear back from us in the next couple weeks. We're adjourned.